handguns were designed or had the ability to expel a projectile by the action of the explosive black gunpowder. Clearly, the evidence was sufficient for the jury to find Tharp guilty of both counts of felon in possession of a firearm. This assignment of error is without merit.

## CONCLUSION

In conclusion, Tharp failed to preserve the issue of the motion to suppress for appellate review, and given the plain language of § 28-1201, the evidence presented at trial was sufficient for the jury to convict Tharp of two counts of felon in possession of a firearm. Tharp's assignments of error are without merit, and as such, we affirm.

Affirmed.

––––––––––––––––––

Village of Doniphan, a municipal corporation, appellant,
v. Starostka Group Unlimited, Inc.,
a Nebraska corporation, appellee.
___ N.W.2d ___

Filed October 21, 2014.    No. A-13-658.

1. **Directed Verdict: Appeal and Error.** In reviewing a trial court's ruling on a motion for directed verdict, an appellate court must treat the motion as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed; such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from the evidence.

2. **Directed Verdict: Evidence.** A directed verdict is proper at the close of all the evidence only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law.

3. **Judgments: Verdicts.** On a motion for judgment notwithstanding the verdict, the moving party is deemed to have admitted as true all the relevant evidence admitted that is favorable to the party against whom the motion is directed, and, further, the party against whom the motion is directed is entitled to the benefit of all proper inferences deducible from the relevant evidence.

4. ____: ____. To sustain a motion for judgment notwithstanding the verdict, the court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion.

5. **Motions for New Trial: Appeal and Error.** A motion for new trial is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an abuse of discretion.
6. **Verdicts: Juries: Appeal and Error.** A jury verdict will not be set aside unless clearly wrong, and it is sufficient if any competent evidence is presented to the jury upon which it could find for the successful party.

Appeal from the District Court for Hall County: TERESA K. LUTHER, Judge. Affirmed.

Austin L. McKillip, of Cline, Williams, Wright, Johnson & Oldfather, L.L.P., and James H. Truell, of Truell, Murray & Associates, for appellant.

Larry E. Welch, Jr., of Welch Law Firm, P.C., for appellee.

IRWIN, MOORE, and PIRTLE, Judges.

PIRTLE, Judge.

## INTRODUCTION

The Village of Doniphan, a municipal corporation, appeals from an order of the district court for Hall County, which entered judgment upon the verdict of the jury finding that Doniphan's breach of contract claim against Starostka Group Unlimited, Inc. (Starostka Group), a Nebraska corporation, was barred by the statute of limitations. Doniphan contends that the trial court erred in failing to grant its motion for directed verdict and erred in failing to grant its motion for judgment notwithstanding the verdict or, in the alternative, a motion for new trial. Based on the reasons that follow, we affirm the judgment of the district court.

## BACKGROUND

This action arises from a breach of contract claim brought by Doniphan against Starostka Group. Specifically, in August 2005, Starostka Group entered into an agreement with Doniphan to construct a sanitary sewer system and water lines according to prescribed specifications for a new residential development known as Hoffman subdivision. In the spring of 2006, the subdivision experienced significant drainage and standing water problems which caused sinking and damage to

the paving above the sanitary sewer system and water lines constructed by Starostka Group.

On February 11, 2010, Doniphan commenced this action to recover damages, alleging that Starostka Group breached the construction contract by failing to comply with the specifications for the design and construction of the project. In its amended answer filed October 21, Starostka Group raised the affirmative defense that Doniphan's claims were barred by the applicable statute of limitations.

Starostka Group filed a motion for summary judgment, which the trial court overruled. The court found that the substantial completion date of the project presented a genuine issue of material fact.

The case proceeded to a jury trial on the issue of when substantial completion of the project occurred, thereby determining whether Doniphan's claim against Starostka Group was barred by the statute of limitations. The evidence presented showed that Doniphan and Starostka Group entered into a written construction contract whereby Starostka Group agreed to complete the work necessary for "[t]he installation of water and sewer mains for the proposed [s]ubdivision as well as the earthwork needed to bring the site to the proposed elevations." The contract listed a start date in August 2005, listed the total price for Starostka Group's work on the project as $197,475.34, and provided for progress payments of the total contract price as the work was completed. The contract named JEO Consulting Group, Inc. (JEO Consulting), as the project engineer and authorized it to act as Doniphan's representative. The contract specifically stated that JEO Consulting would act as the initial interpreter of the requirements of the contract and the judge of the acceptability of the work thereunder. As such, upon receipt of an application for progress payment from Starostka Group, JEO Consulting inspected the work completed by Starostka Group before it recommended that Doniphan make partial payments under the contract.

The contract also addressed the specifications for disinfection of the water distribution system and required that Starostka Group disinfect the water lines and document that the lines had passed two consecutive bacteriological tests. The

contract further provided that separate payment for disinfection and bacteriological testing of the water lines would not be made and that such work is considered subsidiary to the work indicated in the project.

On or about August 29, 2005, Starostka Group was given a notice to proceed by Doniphan to construct the project's sewer system and water lines. At the end of September, Starostka Group submitted its first "Contractor Application for Payment" to JEO Consulting requesting payment in the amount of $142,144.63 for work on the project completed through September 29.

At the October 2005 meeting of Doniphan's board of trustees (the Board), Dale Sall, who served as the project engineer for JEO Consulting, presented Starostka Group's payment request for approval by the Board. Upon unanimous approval by the Board, Doniphan issued to Starostka Group a check in the amount requested.

On October 31, 2005, Starostka Group submitted its second "Contractor Application for Payment" to JEO Consulting requesting payment in the amount of $46,163.84 for work on the project completed through October 28. At the Board's November 2005 meeting, Sall presented Starostka Group's second payment request for approval. The Board decided to postpone payment of the second payment request until Starostka Group could sanitize the water system and provide passing bacteriological tests.

On December 5, 2005, Starostka Group submitted its third and final "Contractor Application for Payment" to JEO Consulting requesting payment in the amount of $13,324.10 for work completed on the project through December 5. At the Board's December 12 meeting, Sall presented Starostka Group's third and final pay request for approval. According to the Board's meeting minutes, Sall also reported that the water lines constructed by Starostka Group had now successfully passed the water tests. The Board unanimously approved payment of Starostka Group's second payment request, in the amount of $46,163.84, which had been postponed the previous month. The Board also agreed to approve final payment of all but $2,000 of the total contract price. The $2,000 was

withheld to ensure that Starostka Group finished two items on the final "punch list," which included the valve boxes and sealing of the electrical and the lift station. The money withheld did not have anything to do with sanitizing the water or water testing.

In addition to submitting Starostka Group's third and final partial payment application for approval at the Board's December 12, 2005, meeting, Sall also submitted a "Recommendation of Acceptance" of Starostka Group's completed work on the project. Sall testified that he did not prepare a separate certificate of substantial completion for the Board's approval, because when Starostka Group submitted its third and final payment request, it was for 100 percent of all the items in the contract. Sall testified, "Instead of issuing one for substantial and another one that was final, we just issued the one, the final Pay Application or pay request and a final acceptance." Although the Board had approved final payment, less $2,000, the "Recommendation of Acceptance" was not signed by the parties at that time.

On December 20, 2005, Mike Schultes, a JEO Consulting employee, sent an e-mail to Mike Huffaker, a Starostka Group employee, stating that the Department of Health and Human Services was requesting copies of the final bacteriological testing results and that JEO Consulting did not have copies of the results for two locations. Schultes asked Huffaker to fax the missing results to JEO Consulting. On February 27, 2006, Huffaker sent Schultes a fax indicating that the fax included copies of the bacteriological testing results for the two locations that Schultes asked for in December. The test results included in the fax had been performed in February.

During the spring of 2006, at Doniphan's request, Starostka Group performed additional sanitization work and bacteriological testing on the water line in the southeast quadrant of the project. There had been problems with contamination of that water line, and Starostka Group was made aware that the water quality in the southeast quadrant had to be improved before final acceptance of the project would occur. After flushing and chlorinating the line proved unsuccessful, another method for cleaning out the line was used.

In May 2006, Huffaker, on behalf of Starostka Group, sent a fax to Schultes with passing test results from the southeast quadrant and asking for immediate approval of the project in its entirety. The Department of Health and Human Services approved the water system in May 2006, when it received proof of all the necessary passing water tests.

At the Board's June 12, 2006, meeting, Schultes presented the "Recommendation of Acceptance" of all work completed by Starostka Group in the project. The Board unanimously approved and signed the "Recommendation of Acceptance."

Evidence was also presented at trial specifically in regard to substantial completion. Sall testified that he considered Starostka Group's work to be substantially complete as of December 12, 2005, when all but two punch list items were complete and when Doniphan had paid Starostka Group all but $2,000 of the total contract price. He testified that when he signed the final application for payment in December 2005, he believed the project was "100 percent complete" at that time. He added that the two punch list items that were incomplete could be done under the warranty. Sall testified that prior to the Board's December 2005 meeting, he did a walk-through of the total project with Marc Starostka, an owner of Starostka Group, and a Doniphan representative, and that they all agreed everything had been completed according to the contract. He further testified that at the Board's December meeting, he told the Board that the water tests had passed and that the Board should now pay the second application for payment, which it had previously delayed. Sall testified that at the end of the Board's December meeting, the Board wanted Starostka Group to complete the two remaining punch list items, but that there was no request for additional water testing. Sall testified that he did not remember why additional water tests were done after December 2005.

Starostka testified that at the time of the Board's December 2005 meeting, the water lines and sanitary sewer system were capable of being put to effective use. He testified that there was one house in the subdivision at that time that was using a portion of the water lines. Starostka testified that he considered the additional sanitization work and bacteriological testing

done in the spring of 2006 to be warranty work. However, Starostka acknowledged that pursuant to the contract, Starostka Group's 1-year warranty commenced when Doniphan signed a "Recommendation of Acceptance."

Francis Hannon, the maintenance supervisor for Doniphan, testified that Starostka Group's work was completed by December 2005, with the assumption that the water samples had passed testing. Hannon testified that he tests Doniphan's water lines for bacteria on a monthly basis as part of his maintenance-related functions. Hannon testified that in January 2006, he ran water tests from various locations and discovered that several water samples did not pass. He testified that Starostka Group was notified and became involved in trying to get the water lines to pass testing. Hannon stated that Doniphan was able to utilize the entire work done by Starostka Group only after getting passing water tests in May 2006.

Doniphan called two witnesses to testify at trial: Daniel Treat, a member of the Board, and Dana Peterson, a civil engineer called as an expert witness. Treat testified that at the Board's December 2005 meeting, it was his understanding that the water tests had passed. He testified that after the Board's meeting, it was discovered that the water tests had not passed. Treat testified that Doniphan could not utilize Starostka Group's entire work until after the water tests passed in May 2006.

Peterson testified that based on industry standards, substantial completion occurs when the project has been sufficiently completed such that it can serve its intended purpose. He testified that in his opinion, the project at issue was substantially completed in May 2006, because that is when all the test results passed. Peterson also testified that the water test results were not a minor and unimportant aspect of the project, but, rather, were a critical part of the project. Peterson testified that there is no guarantee that a section of water line that passes testing will not later become contaminated such that the section does not pass testing.

At the close of Starostka Group's case in chief, both parties moved for a directed verdict. The trial court overruled

both motions. After Doniphan presented its evidence, both parties renewed their motions for directed verdict, which were overruled.

The jury returned a verdict in favor of Starostka Group, finding that Starostka Group substantially completed its work under the contract prior to February 11, 2006, more than 4 years prior to the filing of the complaint. The trial court entered judgment upon the verdict of the jury, found that Doniphan's breach of contract claim was barred by the statute of limitations, and dismissed Doniphan's claim.

Doniphan subsequently filed a motion for judgment notwithstanding the verdict pursuant to Neb. Rev. Stat. § 25-1315.02 (Reissue 2008) or, in the alternative, a motion for new trial under Neb. Rev. Stat. § 25-1144.01 (Reissue 2008). The trial court overruled the motions.

## ASSIGNMENTS OF ERROR

Doniphan assigns that the trial court erred in (1) failing to grant its motion for directed verdict and (2) failing to grant its motion for judgment notwithstanding the verdict or, in the alternative, for new trial.

## STANDARD OF REVIEW

[1] In reviewing a trial court's ruling on a motion for directed verdict, an appellate court must treat the motion as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed; such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from the evidence. *Wulf v. Kunnath*, 285 Neb. 472, 827 N.W.2d 248 (2013).

[2] A directed verdict is proper at the close of all the evidence only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law. *Id*.

[3,4] On a motion for judgment notwithstanding the verdict, the moving party is deemed to have admitted as true all the relevant evidence admitted that is favorable to the party

against whom the motion is directed, and, further, the party against whom the motion is directed is entitled to the benefit of all proper inferences deducible from the relevant evidence. *Bellino v. McGrath North*, 274 Neb. 130, 738 N.W.2d 434 (2007). To sustain a motion for judgment notwithstanding the verdict, the court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion. *Id*.

[5] A motion for new trial is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an abuse of discretion. *R & D Properties v. Altech Constr. Co.*, 279 Neb. 74, 776 N.W.2d 493 (2009).

## ANALYSIS

Doniphan assigns that the trial court erred in failing to grant its motion for directed verdict and its motion for judgment notwithstanding the verdict or, in the alternative, a new trial. Doniphan argues that the court erred because, based on the evidence presented, reasonable minds can draw only one conclusion—that substantial completion of the project did not occur until May 2006. It contends that because the lawsuit was filed on February 11, 2010, less than 4 years thereafter, its breach of contract claim cannot be barred by the statute of limitations.

The parties stipulated at trial that Doniphan's claims were controlled by the 4-year statute of limitations period that applies to actions against builders and contractors arising from construction activities. See Neb. Rev. Stat. § 25-223 (Reissue 2008). The parties further agreed that the 4-year statute of limitations commenced to run from the date of substantial completion of Starostka Group's work under the contract. The instructions submitted to the jury defined the term "substantial completion" as follows:

> In a construction contract, substantial completion is shown when all the essential elements necessary for the full accomplishment of the purposes of the contract have been performed with such an approximation to complete performance that the owner obtains substantially what is called for by the contract and the resultant work can be

put to its intended purpose. Thus, to establish substantial completion, any deviations from the contract must be relatively minor and unimportant.

See, *Lange Indus. v. Hallam Grain Co.*, 244 Neb. 465, 507 N.W.2d 465 (1993); *Pioneer Enterprises v. Edens*, 216 Neb. 672, 345 N.W.2d 16 (l984).

The contract at issue also provided a definition of the term "substantial completion" and a process by which substantial completion could have been determined for the project:

*Substantial Completion*—The time at which the Work (or a specific part thereof) has progressed to the point where, in the opinion of ENGINEER, the Work (or a specified part thereof) is sufficiently complete, in accordance with the Contract Documents, so that the Work (or a specified part thereof) can be utilized for the purposes for which it is intended.

The contract further provided that "[w]hen CONTRACTOR considers the entire Work ready for its intended use CONTRACTOR shall notify OWNER and ENGINEER in writing that the entire Work is substantially complete (except for items specifically listed by CONTRACTOR as incomplete) and request that ENGINEER issue a certificate of Substantial Completion."

Although the contract provided a process that could have been used for determining the substantial completion date, the process was not initiated by Starostka Group, no substantial completion was ever declared, and no certificate of substantial completion was ever issued. Sall testified that it was not unusual for a certificate of substantial completion to not be issued and to move forward to final completion. Starostka testified that Starostka Group typically does not ask that a certificate of substantial completion be issued. Because there was no substantial completion date determined by the parties, it became a question of fact for the jury to decide, ultimately leading to a determination of whether Doniphan's cause of action against Starostka Group was filed within the 4-year statute of limitations.

The jury had to determine whether the date of substantial completion of the project was in December 2005, as argued by

Starostka Group, or was in May 2006, as argued by Doniphan. Doniphan argues that substantial completion did not occur until May 2006, because the water line in the southeast quadrant did not have passing bacteriological test results until then, and therefore, the entire water system could not be used for its intended purpose before May 2006. It further suggests that Starostka Group's contractual work of disinfecting the water lines and obtaining passing bacteriological test results was critical to Doniphan's ability to use the water system and not a "minor and unimportant" deviation from the contract.

A provision in the contract specifically required Starostka Group to disinfect the water system and provide passing bacteriological tests for the entire system. The specification required two consecutive passing test results taken in a set at least 24 hours apart, from various stations, so as to ensure that the entire system had been properly tested and sanitized. In the event of a bacteriological test failure, Starostka Group was required to repeat the disinfection process and repeat the testing. Doniphan contends that Starostka Group's work in meeting this specification continued into the spring of 2006, because portions of the system remained contaminated by coliform, specifically the southeast quadrant, and no passing tests were achieved on that quadrant until May 2006.

There was evidence presented that Starostka Group was sanitizing and testing the water line in the southeast quadrant in the spring of 2006 and that passing test results were obtained in May 2006. In May 2006, Starostka Group sent JEO Consulting a fax containing passing tests for the southeast quadrant and asking for immediate approval of the project in its entirety. The "Recommendation of Acceptance" was not approved and signed by Doniphan until June 2006, after the southeast quadrant had passing tests. Further, the Department of Health and Human Services did not approve the water system until May 2006, when it received proof of all passing water tests. Hannon and Treat testified that Doniphan was able to utilize the entire work done by Starostka Group only after getting passing water tests in May 2006. In addition, Peterson testified that in his opinion, the project was substantially completed in May 2006.

Although there is evidence to support Doniphan's position that substantial completion did not occur until May 2006, there is also evidence to support Starostka Group's position that substantial completion occurred in December 2005. An exhibit was entered into evidence containing two consecutive passing tests from the water line in the southeast quadrant in the fall of 2005, specifically November 10 and 16. Doniphan contends that these two passing tests do not satisfy the contract provision because they are not part of the same set. Doniphan also points out that the exhibit contains another water test from November 17 that shows a failed result. However, there is no indication in the evidence as to whether or not the subsequent failed test rendered the two passing tests void. On the face of the testing provision in the contract, the two consecutive tests result in the segment's passing the testing requirement. Peterson, Doniphan's own expert, testified that there is no guarantee that a water line that passes bacteriological testing at one point will never be contaminated in the future. Peterson agreed that the purpose of Hannon's performing monthly tests of the water lines in Doniphan was to ensure that the water had not been compromised.

Further, even if there were no passing tests from the water line in the southeast quadrant in accordance with the contract until May 2006, there was other evidence presented such that reasonable minds could differ and draw more than one conclusion from the evidence in regard to when substantial completion occurred.

First, the contract specifically stated that disinfection of the water lines and bacteriological testing were not considered primary to the work indicated in the project.

Second, in December 2005, the Board approved Starostka Group's second payment request, which it had postponed the month before until Starostka Group could sanitize the water system and provide passing bacteriological tests. The Board approved the second payment request based on Sall's report that the water lines had passed water tests. The $2,000 that was withheld in December 2005 related to the third and final request for payment and had nothing to do with the testing of the water lines. At this point, the Board had

approved payment of all but $2,000 on a $200,000 contract. The "Recommendation of Acceptance" submitted by Sall at the Board's December 2005 meeting was denied based only on the two punch list items that needed to be completed for which the $2,000 was withheld.

Third, Sall testified that he considered Starostka Group's work to be substantially complete as of December 12, 2005, when all but two punch list items were complete and when Doniphan had paid Starostka Group all but $2,000 of the total contract price. Pursuant to the contract, Sall, on behalf of JEO Consulting, had a duty to inspect Starostka Group's work and judge the work completed before submitting his recommendation to Doniphan for final acceptance. Sall testified that when he signed the final application for payment in December 2005, he believed the project was complete at that time, with the exception of two small punch list items. He also testified that prior to the Board's December meeting, he did a walk-through of the total project with Starostka and a Doniphan representative, and that they all agreed that everything had been completed according to the contract.

Fourth, Starostka testified that at the time of the Board's December 2005 meeting, the water lines and sanitary sewer system were capable of being put to effective use. He also testified that a newly constructed home in the subdivision was receiving service from the water lines constructed by Starostka Group at that time. Although the home was not using the entire water system, its use is still evidence that the water lines were being used for their intended purpose.

A directed verdict is proper only when reasonable minds can draw but one conclusion from the evidence, where an issue should be decided as a matter of law. See *Bellino v. McGrath North*, 274 Neb. 130, 738 N.W.2d 434 (2007). Similarly, to sustain a motion for judgment notwithstanding the verdict, the court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion. *Id*. The jury in the instant case was presented with the question of fact as to when substantial completion of the contract occurred. Both parties submitted evidence supporting their opposing positions as to when substantial

completion occurred. Because reasonable minds could differ and draw more than one conclusion from the evidence, including a conclusion that substantial completion occurred prior to February 11, 2006, the trial court did not err in overruling Doniphan's motion for directed verdict or its motion for judgment notwithstanding the verdict.

[6] In regard to Doniphan's alternative motion for new trial, a motion for new trial is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an abuse of discretion. See *R & D Properties v. Altech Constr. Co.*, 279 Neb. 74, 776 N.W.2d 493 (2009). Doniphan argues that it was entitled to a new trial because the jury's verdict and the judgment entered thereon were not supported by sufficient evidence and were contrary to law. A jury verdict will not be set aside unless clearly wrong, and it is sufficient if any competent evidence is presented to the jury upon which it could find for the successful party. *Wulf v. Kunnath*, 285 Neb. 472, 827 N.W.2d 248 (2013).

As set forth above, Starostka Group presented substantial and competent evidence to support its position that it had substantially completed its work in December 2005. The trial court did not abuse its discretion in overruling Doniphan's motion for new trial.

## CONCLUSION

We conclude that the trial court did not err in overruling Doniphan's motion for directed verdict and motion for judgment notwithstanding the verdict or, in the alternative, motion for new trial. There was sufficient and competent evidence presented for the jury to conclude that Starostka Group had substantially completed its work under the contract prior to February 11, 2006. Accordingly, the judgment of the district court entering judgment on the verdict and dismissing Doniphan's breach of contract action against Starostka Group as being barred by the statute of limitations is affirmed.

Affirmed.